IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                Case No. 18-10164-JWB

JACOB E. SILCOTT,

        Defendant.

**MEMORANDUM AND ORDER**

This matter comes before the court on Defendant's motion to suppress evidence. (Doc. 17.) The motion is fully briefed. (Docs. 20, 21, 22.) The court held an evidentiary hearing on March 18, 2019, and took the motion under advisement. The court is now prepared to rule. For the reasons set forth herein, the motion is DENIED.

**I. Facts**

The court finds the following facts from the evidence presented at the hearing. Sgt. Maurice Mitchell of the Wichita Police Department (WPD) was on duty in the early morning hours of May 27, 2018. Mitchell was on patrol in a marked police car near the intersection of 21st and Ridge Road at about 3:30 a.m. Minutes before, police received notice of an alarm going off at a business named Crescent Oil near 21st and West streets, a couple of miles east of Mitchell's location. Mitchell heard a radio dispatch stating that officers at the business reported it was a "good alarm," meaning it was valid. The officers reported a possible entry into the business and that there were yellow tow straps in the parking lot. Mitchell was familiar with some recent burglaries to small businesses in which burglars had used yellow tow straps to forcibly extract

automated teller machines (ATMs) from the businesses. Mitchell was aware that in at least one of the prior burglaries, a pickup truck was used to haul away an ATM.

Within a few minutes of receiving this information, Mitchell was southbound on Ridge Road, stopped at the traffic light at 21st street, when he saw a pickup truck travel through the intersection heading west on 21st street. As it passed by, he noticed objects partially sticking up above the side wall and tailgate of the pickup bed. He could not tell what the parts were, but he suspected they might be parts from an ATM. Mitchell radioed that he saw a pickup with some debris in it and was going to follow it. He requested that an officer assist him. Mitchell turned west on 21st street and followed the pickup at a distance, staying back because he was waiting for another officer to arrive and because he could not blend into traffic, as the pickup was the only other car on the street at that late hour. The pickup turned left (south) on Tyler Road (about one mile west of Ridge Road), and Mitchell followed it southbound on Tyler. Sgt. Cory of the WPD reported via radio that he was approaching Mitchell from behind. Mitchell advised Cory that he was going to stop the pickup because he suspected it was involved in the burglary. Mitchell activated his overheard emergency lights near the 800 block of north Tyler. The truck pulled over to the curb and stopped. There was nothing unusual about the way the pickup stopped. Mitchell testified he suspected the truck of involvement in the apparent burglary because of the debris sticking out of the pickup bed, which he thought might be parts of an ATM, although at that point he could not tell what the parts were.

Mitchell stayed in his car for a brief time after the pickup stopped, as he entered the truck's license plate number into his computer and spoke with the police dispatcher. Sgt. Cory pulled in behind Mitchell with his emergency lights flashing. Approximately one minute after the initial stop, Mitchell opened his door and started to put his foot on the ground, at which time the pickup

2

truck suddenly took off at a high rate of speed. Mitchell closed his door and pursued the truck. At some point the truck left the roadway, drove through a residential yard, over some railroad ties, crossed the street, went down in a ditch and crashed into a wrought iron fence. Mitchell got out of his car and was yelling verbal commands as he approached the truck. The truck was centered over a ditch and Mitchell could see and hear the driver, a white male, attempting to restart the truck, which had stalled out. Mitchell approached and opened the driver's door, at which point the driver immediately jumped out. Mitchell fell in the ditch as the driver – later identified as Defendant – went running past him. As Mitchell got up, he noticed a handgun on the floor of the truck cab by the driver's open door.

Officers photographed and seized the handgun by the driver's door. A subsequent search of the truck disclosed a sawed-off shotgun on the back seat. The objects in the bed of the pickup were found to be auto parts, including a large piece of plastic molding and what appears to be the folded seat of a car with an attached headrest. Defendant was apprehended some time after the above-described incident, although the evidence did not show when or how that occurred.

**II. Discussion**

Defendant contends the stop of the pickup truck constituted a seizure under the Fourth Amendment and that it was unlawful because it was not supported by reasonable suspicion. He further contends the firearms found in the truck were the product of the unlawful seizure, such that they must be suppressed as "fruit of the poisonous tree."[1] Doc. 17. In response, the government argues Defendant was not seized within the meaning of the Fourth Amendment because he fled without submitting to the officer's show of authority. It further contends Defendant abandoned the vehicle after it crashed, such that he had no reasonable expectation of privacy in its contents

---

[1] Defendant is charged with one count of unlawful possession of a short-barreled shotgun that was not registered to him, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. (Doc. 1.)

when the officers searched it. Doc. 21. At the conclusion of the evidentiary hearing, the government additionally asserted the evidence showed that the officer had reasonable suspicion to stop the pickup truck.

    A.   <u>Fourth Amendment seizures</u>. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. The defendant bears the burden of proving whether and when the Fourth Amendment was implicated. If the defendant meets his burden of showing a warrantless seizure, the burden then shifts to the government to show that the seizure was reasonable. *See United States v. Shrum,* 908 F.3d 1219, 1229 (10th Cir. 2018).

    The existence of a seizure is a question of law. In determining whether a seizure occurred, the court first applies an objective test to consider whether a reasonable person would have felt free to leave or terminate the encounter with the officer. *United States v. Gaines,* \_\_\_F.3d\_\_\_, 2019 WL 1120405, *2 (10th Cir. Mar. 12, 2019). Under the so-called *Mendenhall* test, a seizure can occur only if a reasonable person would not have felt free to leave or terminate the encounter. *California v. Hodari D.*, 499 U.S. 621, 627-28 (1991) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). When a defendant claims that a seizure resulted from an officer's show of authority, the *Mendenhall* test asks objectively whether the officer's words and actions would have conveyed to a reasonable person that he was being ordered to restrict his movement. *Id.* But that only states a necessary, rather than a sufficient, condition for a seizure effected through a show of authority. *Id.* at 628. A person is not seized within the meaning of the Fourth Amendment until he yields to the officer's show of authority or the officer applies physical force. *See id.* (youth who fled an approaching officer was not seized until officer tackled him.); *Gaines,* 2019 WL 1120405, *2 ("Even if a reasonable person would not have felt free to leave, a seizure would occur only if the suspect yielded to a police officer's show of authority.")

Thus, "[w]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'" *United States v. Salazar,* 609 F.3d 1059, 1064 (10th Cir. 2010) (citing *Hodari D.*, 499 U.S. at 626)). The use of police car emergency flashing lights to make a traffic stop, as was done here, can constitute a show of authority. *See Brendlin v. California*, 551 US 249 (2007) (all occupants of a car were seized by officer's "successful display of authority" in using flashing lights to make traffic stop). *See also Gaines*, 2019 WL 1120405, at *2, n.4 (citing 4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.4(a), at 598–99 (5th ed. 2012) (stating that the "use of flashing lights as a show of authority ... will likely convert the event into a Fourth Amendment seizure")). The court finds that a reasonable person in Defendant's position would not have felt free to leave or to disregard the officer's flashing lights. The officer thus made a show of authority. The remaining disputed question is whether Defendant submitted to the show of authority such that a seizure occurred.

The Tenth Circuit has addressed the "submission to authority" component on numerous occasions, including most recently in *Gaines*, *supra*. In *Gaines*, a man was sitting in his vehicle when two marked police cars stopped directly behind him with their roof lights flashing. One uniformed officer gestured for the man to get out. The man got out and responded to the officers' questions. When the officers asked for identification, the man opened the trunk of his car to retrieve it, but he then turned and fled on foot. The Tenth Circuit concluded that by the time the man fled he "had already yielded to the show of authority." *Id.*, 2019 WL 1120405, at *4. The *Gaines* majority cited a case from another circuit holding that a man had submitted to authority by responding to an officer's questions, and also cited *United States v. Morgan,* 936 F.2d 1561 (10th Cir. 1991). In *Morgan*, a police car with its lights flashing followed a vehicle for several blocks

5

until the car pulled into a driveway and stopped. A man then got out of the passenger side of the car. A uniformed officer approached and told the man to "hold up." In reply, the man said, "What do you want?" and began backing away. The officer told the man not to run, but he fled. The *Morgan* panel concluded that the man was seized because he yielded "at least momentarily" to the officer's show of authority. *Id.* at 1567.

*Morgan* appears to represent the outer limits of submitting or yielding to a show of authority. Other courts have declined to adopt *Morgan's* reasoning, and the Tenth Circuit itself has indicated it is limited to its facts. *See United States v. Baldwin*, 496 F.3d 215, 218-19 (2d Cir. 2007) (declining to adopt *Morgan's* reasoning); *Salazar,* 609 F.3d at 1068 ("the *Morgan* holding involved a pedestrian rather than a motorist, and, as a result, its reasoning as to when a submission to authority occurred is not directly applicable here"); *Brooks v. Gaenzle,* 614 F.3d 1213, 1225, n.9 (10th Cir. 2010) ("In *Morgan*, we determined a person's momentary yielding to an officer's apparent show of authority before fleeing was relevant to our seizure determination. [citation omitted] But, in making our seizure determination, we also relied on the fact the suspect was in a car followed for several blocks by a police car with its overhead lights activated before it pulled over and he exited and verbally responded to the officers' show of authority before fleeing on foot.")

The Supreme Court pointed out in *Brendlin* that "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin,* 551 U.S. at 262. In *Brendlin* the Court found a passenger in a car stopped by police "was seized from the moment [the car] came to a halt on the side of the road," explaining that the passenger "has no effective way to signal submission while the car was still moving on

6

the roadway, but once it came to a stop he could, and apparently did, submit by staying inside." *Id.* at 263. In the specific context of traffic stops, a number of courts have addressed a scenario where a vehicle stops briefly in response to flashing police lights, but then drives away before an officer can approach and speak to the driver. In *Baldwin,* the Second Circuit succinctly stated:

> When a driver heeds a police order to stop only to drive away as the police approach, has the driver been seized within the meaning of the Fourth Amendment? We hold that a seizure requires submission to police authority, and conclude that the driver's initial fleeting stop does not amount to such submission.

*Baldwin*, 496 F.3d at 216. The Tenth Circuit has apparently not addressed this particular situation. But it has cited *Baldwin* on at least four occasions, including with apparent approval in *Salazar,* where it noted that "to comply with an order to stop – and thus to become seized – a suspect must do more than halt temporarily; he must submit to police authority, for 'there is no seizure without actual submission.'" *Id.*, 609 F.3d at 1065-66 (quoting *Baldwin*, 496 F.2d at 218 and *Brendlin*, 551 U.S. at 254.) *See also Farrell v. Montoya,* 878 F.3d 933, 938 (10th Cir. 2017). Other courts have adopted the same conclusion as *Baldwin*. A recent district court decision surveyed cases "where a driver resumes driving or otherwise retreats either immediately or shortly after bringing his car to a halt," and concluded that "courts have consistently held that the driver's temporary halt in movement does not constitute acquiescence to police authority." *United States v. Garrette*, No. 3:17CR022/MCR, 2017 WL 3337258, at *2 (N.D. Fla. Aug. 4, 2017), *aff'd,* 745 F. App'x 124 (11th Cir. 2018) (citing cases).

The reasoning of *Baldwin* and similar cases is persuasive. In the specific context of a traffic stop, the brief stop of a car in response to emergency lights, followed by the flight of the vehicle before an officer is able to approach and talk to the driver, does not objectively demonstrate submission to the officer's show of authority. It is more accurately viewed as an attempted seizure thwarted by the flight of the vehicle before the officer can speak to the driver. *See Brendlin*, 551

7

U.S. at 254 ("there is no seizure without actual submission; otherwise, there is at most an attempted seizure"). The use of emergency lights to stop a moving vehicle would be understood by a reasonable person in Defendant's circumstance to convey not only a directive to stop the vehicle, but also to stay and submit to the officer's inquiries. "Submission under *Hodari D.* requires, at a minimum, that a suspect manifest compliance with police orders." *United States v. Mosely,* 743 F.3d 1317, 1326 (10th Cir. 2014) (citation omitted). The question of whether the person has submitted is an objective one that is examined from the view of a reasonable law enforcement officer under the circumstances. *Id.* at 1325. Stopping a vehicle and then fleeing before the officer approaches is the opposite of submission. Rather, it would indicate to a reasonable officer that the person has only halted temporarily to gain an advantage in flight and is not willing to comply with the show of authority insofar as it directs the driver to submit to a police inquiry. Absent submission to that directive – even if only briefly – the driver cannot reasonably be considered to have been seized under the *Hodari* test. *See also United States v. Washington*, 12 F.3d 1128, 1132 (D.C. Cir. 1994) (driver who drove off as officer was approaching "did not in fact submit to the officer's order.")

Indeed, as Officer Mitchell testified at the hearing, a reasonable officer is likely to have considerable doubts about whether a driver in a typical traffic stop has truly submitted to his a show of authority until the officer approaches the vehicle, makes contact with the driver, and determines that the driver is in fact going to respond to questions and requests for identification, vehicle registration, etc., and that the driver is not merely engaged in some ruse or subterfuge to escape or otherwise thwart the attempted seizure. While there is no guarantee that the driver or a passenger might not feign submission beyond the initial contact with the officer, the reasoning of the various courts of appeal that submission requires the driver to not only stop his vehicle but

8

remain stopped at least until the driver begins complying with the officer's commands or responding to the officer's questions provides a much more objective basis to determine that a Fourth Amendment seizure has occurred. Were the rule otherwise, a driver who stops his car and lies in wait with a gun as the officer approaches would be considered seized under the Fourth Amendment, even though it is clear in retrospect that the driver never had any intention of submitting to the show of authority.

The court recognizes that in this case Defendant may be viewed as having stopped his vehicle for more than just a "moment." The evidence indicated that he stopped it for about one minute while the officer entered the license plate in a computer. But considering the totality of the circumstances, Defendant never manifested submission to the implied directive to speak to the officer, and he was thus never effectively seized. *Cf. Baldwin*, 496 F.3d at 219 ("it is the nature of the interaction, not its length, that matters"); *United States v. Roberson,* 864 F.3d 1118, 1124 (10th Cir. 2017) (Matheson, J. concurring) ("The question is whether, based on the nature of the show of authority, [defendant] submitted to that initial show of authority.").

B.  <u>Reasonable suspicion</u>.  The finding that no seizure occurred arguably makes it unnecessary to determine whether Sgt. Mitchell had reasonable suspicion to justify the initial stop of Defendant's vehicle. Nevertheless, given the absence of any Tenth Circuit case directly on point with regard to the seizure question, the court will address the government's additional argument concerning reasonable suspicion.

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court "established that a law enforcement officer may, in appropriate circumstances and in an appropriate manner, approach a person to investigate possible criminal behavior even if he lacks probable cause to arrest." *United States v. Whitley,* 680 F.3d 1227, 1232 (10th Cir. 2012) (citation omitted.)  To be considered reasonable,

such an "investigatory detention" must be justified at its inception and reasonably related in scope to the circumstances that justified the interference in the first place. *United States v. Martinez,* 910 F.3d 1309, 1313 (10th Cir. 2018). An officer's traffic stop of a vehicle is considered justified at its inception if the officer has a reasonable suspicion that criminal activity may be afoot. *Whitley*, 680 F.3d at 1233.

Whether reasonable suspicion exists does not depend on any one factor, but on the totality of the circumstances. *United States v. Martinez*, 910 F.3d 1309, 1313 (10th Cir. 2018). Before initiating an investigatory stop, an officer must have a "particularized and objective basis for suspecting an individual may be involved in criminal activity." *Id.* (citation omitted.) An officer need not rule out the possibility of innocent conduct, however; he or she "simply must possess 'some minimal level of objective justification' for making the stop." *Id.* (citations omitted.) The standard allows officers to draw on their own experience and specialized training to make deductions about the cumulative information available to them that might well elude an untrained person. *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (citation omitted.) And as the Supreme Court made clear in *Arvizu*, factors that are susceptible of innocent explanation when considered alone may nevertheless form a sufficient basis to warrant further investigation when taken together.

Based on the totality of the circumstances, the court concludes Sgt. Mitchell had a particularized and objective basis to suspect that the occupants of the pickup truck were involved in criminal activity, such that a brief investigative detention was warranted. Mitchell was aware of an apparent burglary having occurred only a short time and distance away from the point at which he first saw the pickup truck. The evidence showed there was little or no traffic on the street at that hour (around 3:30 a.m.) Officers at the scene of the alarm informed Mitchell of the presence

of yellow tow straps, which Mitchell knew from his experience had been used in another recent burglary to remove an ATM machine, which was then carried away in a pickup truck. A map of the area (Def. Exh. 1) shows that if a person intended to drive west from Crescent Oil, they likely would have done so by taking 21st street, where Mitchell first saw Defendant's pickup. The presence of the plastic or metal debris in the pickup, which Mitchell could not identify while the truck was moving, provided additional factual support for Mitchell's suspicion that the truck may have been involved in a burglary at Crescent Oil. Photos of the debris from the truck (Exhibits SH1, SH2, and SH3) support a finding that when Sgt. Mitchell caught a glimpse of the items as the truck passed by, he could have reasonably, even if mistakenly, believed they were the remnants of an ATM that had been ripped out of a business. Taking all of the circumstances together, the officer had a particularized and objective basis for suspecting that the occupants of the truck were involved in criminal activity. The facts known to the officer were obviously not enough to prove the commission of an offense, but they were clearly more than a mere hunch, and the totality of circumstances justified a brief investigative detention. *Cf. Arvizu,* 534 U.S. at 276 (the likelihood of criminal activity for reasonable suspicion "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.") (citation omitted.) Accordingly, even if the initial stop of the vehicle was a seizure within the meaning of the Fourth Amendment, it was supported by reasonable suspicion and was therefore reasonable.

    C. <u>Abandonment</u>. Defendant's argument concerning abandonment is premised on his contention that the initial stop of the vehicle was unlawful because it was done without reasonable suspicion. (*See* Doc. 21 at 7) ('because the initial stop of Mr. Silcott was done without reasonable suspicion … the abandonment doctrine is inapplicable.") As indicated above, the court finds there

11

was reasonable suspicion to support the stop. Defendant's argument concerning abandonment therefore lacks merit.

> The Tenth Circuit recently summarized the doctrine of abandonment as follows:
>
> The Fourth Amendment is not implicated when police search property that has been abandoned. *See United States v. Juszczyk*, 844 F.3d 1213, 1213 (10th Cir. 2017). Abandonment occurs if either (1) the owner subjectively intended to relinquish ownership of the property or (2) the owner lacks an objectively reasonable expectation of privacy in the property. *See id*. at 1214; *United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997). The owner's abandonment must be voluntary, and abandonment cannot be voluntary when it results from a violation of the Fourth Amendment. *United States v. Ojeda-Ramos*, 455 F.3d 1178, 1187 (10th Cir. 2006).

*United States v. Easley*, 911 F.3d 1074, 1083 (10th Cir. 2018). Applying these standards to the facts of the case, the court concludes Defendant lacked an objectively reasonable expectation of privacy in the truck at the time it was searched. The facts show Defendant voluntarily abandoned the vehicle. He fled from the police in the truck before crashing into a fence, and when the police closed in he jumped out of the truck and ran off, leaving the driver's door open and the vehicle sitting in a ditch off the side of a road with a firearm sitting on the floorboard in plain view. These facts support a conclusion that Defendant voluntarily abandoned the truck, such that he lacked a reasonable expectation of privacy in it.[2] *See United States v. Hudson,* No. 18-40036-HLT, 2019 WL 572653, *3 (D. Kan. Feb. 12, 2019) (defendant abandoned firearm in vehicle by running off in the face of police pursuit); *United States v. Russian,* No. 14-10018-EFM, 2015 WL 1863333, *3 (D. Kan. Apr. 23, 2015) (suspect who fled from vehicle as a result of police pursuit voluntarily abandoned the vehicle).

---

[2] The court indicated to counsel before the hearing that application of the abandonment doctrine appeared doubtful. After hearing the evidence, however, the court concludes the doctrine applies for the reasons stated above. If either party contends that some evidence relevant to abandonment was not presented at the hearing due to the court's comment prior to the hearing, the party may file a motion for reconsideration within ten days of this order.

Even if the abandonment doctrine did not apply, however, the search of the vehicle and the seizure of the weapons therein were reasonable based on legitimate safety concerns. The officers could plainly see through the open door of the vehicle that one firearm was left unsecured in an area accessible to the public. This knowledge and the circumstances under which Defendant fled from the vehicle gave officers reasonable grounds to search the car and to seize the plainly visible firearm, as well as any other firearms found therein, for the purpose of protecting the safety of both the officers on the scene and the public at large. *See United States v. Otero*, No. 16-2675-JTM, 2019 WL 1226828, *4 (D. N.M. Mar. 15, 2019) (officers could retrieve plainly visible firearm from car to protect officer safety); *Resley v. Holmes,* 59 F.Supp.2d 1164, 1171 (D. Kan. 1999) (officers could lawfully seize firearm from car near a public road, in interest of public safety, where gun was visible to anyone standing outside vehicle). *See also id.* (citing cases finding public safety search appropriate in cases involving firearms left in vehicles.) Defendant's reasonable privacy interests in the contents of a vehicle from which he fled, to the extent they existed at all, were clearly outweighed by valid interests in protecting the safety of the public and the officers from the danger of accessible firearms left in the vehicle. *Cf. Cady v. Dumbrowski,* 413 U.S. 433, 448 (1973) ("Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not 'unreasonable'….")

IT IS THEREFORE ORDERED this 27th day of March, 2019, that Defendant's motion to suppress evidence (Doc. 17) is DENIED.

\_\_\_s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE